[Crim. No. 2379. In Bank.—May 5, 1922.]

THE PEOPLE, Respondent, v. ALFRED ELLIS, Appellant.

[1] CRIMINAL LAW—MURDER—SUFFICIENCY OF EVIDENCE—APPEAL.— Where in a prosecution for murder there is evidence tending to support the verdict attaching the death penalty, it cannot be disturbed upon the ground that it is not sustained by the evidence, since the weight to be accorded the evidence is a question for the jury.

[2] ID.—SALE OF LIQUOR BY DEFENDANT TO DECEASED.—In a prosecution for murder, it was not error to permit the state to introduce testimony that during the evening preceding the morning of the homicide, the defendant at his home had sold alcoholic liquor to the deceased, notwithstanding it tended to prove another offense, where the killing occurred upon the return of the deceased to defendant's home, since such testimony tended to show the purpose of the return of the deceased and whether the defendant was justified in believing that the deceased intended to assail his home and commit a felony or to purchase more liquor.

[3] ID.—ESCAPE AFTER ARREST.—In a prosecution for murder, it was not error to permit the introduction of testimony of the escape of the defendant from jail after his arrest, since there is no differ-

ence, so far as the act evidences consciousness of guilt, between flight before and after arrest.

[4] ID.—ENTRANCE AND EXIT OF BULLET.—In a prosecution for murder, testimony of competent experts in the use of firearms and of medical experts that the bullet which killed the deceased entered at the back and came out the abdomen was admissible, and not subject to the objection that the entrance and exit of the bullet was a question for the sole determination of the jury.

[5] ID.—TESTIMONY OF EXPERT—CHANGE OF OPINION AS TO ENTRY OF BULLET—EFFECT OF.—Where in a prosecution for murder a medical expert testified at the preliminary examination that in his opinion the fatal bullet entered the abdomen of the deceased but upon the trial stated that he believed the bullet entered the back, and stated his reasons for such change of opinion, the fact that the witness changed his mind was not a ground for excluding his testimony, but merely affected its weight.

[6] ID.—ENTRANCE OF BULLET—OPINION OF EXPERTS—PROCEDURE.—In a prosecution for murder, it was not error to permit experts to base their opinion as to the point of entrance of the bullet which killed the deceased upon what they gathered from an examination of the body and clothing instead of asking them a formal hypothetical question.

[7] ID.—VERDICT—DEATH PENALTY—RACE—EFFECT OF.—In a prosecution for murder, the mere fact that the defendant is a colored man and the murdered person a white man falls far short of establishing prejudice and passion on the part of the jury warranting the setting aside upon such ground of a verdict attaching the death penalty.

[8] ID. — APPEAL — SCOPE OF REVIEW. — Where on an appeal from a judgment of conviction of murder attaching the death penalty the court is satisfied that there is sufficient evidence to justify the verdict, its inquiry on that point is ended, and the question whether the lighter punishment should have been inflicted cannot be considered.

APPEAL from a judgment of the Superior Court of Ventura County and from an order denying a new trial. Merle J. Rogers, Judge. Affirmed.

The facts are stated in the opinion of the court.

Charles F. Blackstock for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, and John W. Maltman, for Respondent.

SHURTLEFF, J.—Defendant and appellant was accused in an information filed by the district attorney of Ventura County with the crime of murder, and upon the trial the jury found him guilty of murder in the first degree, attaching the death penalty. Prior to judgment defendant moved for a new trial, which was denied, and thereupon sentence of death was pronounced. Defendant appeals from this judgment and the order denying his motion for a new trial.

One of the contentions of defendant is that the verdict is not sustained by the evidence. The facts are as follows: Carlton E. Stannard (a white man) with two companions left a restaurant, where they had met by chance, in the city of Oxnard, Ventura County, this state, at about 1:30 o'clock on the morning of March 16, 1921, and walked in a southerly direction down Saviers Road and thence in a westerly direction down Seventh Street in said city. As they were proceeding on Seventh Street they heard music coming from the home of defendant located on the corner of Seventh and B Streets; Stannard, who is frequently hereinafter referred to as the "deceased," went to the back door of his house and inquired of the defendant, who is a colored man, if he, deceased, and his companions could come in, and, receiving an affirmative answer, they entered the house. The defendant was giving a dance for the entertainment of certain members of a theatrical company composed of colored people, which was then playing in Oxnard. The deceased and others present were served with intoxicating liquor by the defendant, for which he was paid. The companions of deceased left in a short time, but deceased remained. At the conclusion of the dance, at an early hour in the morning, all of the guests, including the deceased, excepting a colored musician named Carr, belonging to said theatrical company, left the defendant's home. The defendant's wife was present at the dance, but became intoxicated to an extent which incapacitated her, and, during the happening of the events immediately connected with and leading up to the shooting which resulted in the death of Stannard, was lying stupefied and asleep upon the bed in the house. At about a quarter to 4 o'clock in the morning, and apparently after the departure of de-

ceased, the defendant accompanied Carr to a rooming-house across the street from defendant's dwelling, where he secured Carr a lodging for the night. Having thus provided for Carr the defendant left this rooming-house, presumably returning to his home, and Carr retired. The proprietress of this lodging-house testified that at about 4:30 or twenty-five minutes to 5 o'clock in the morning (March 16, 1921) she heard a shot "and it sounded awful close and muffled like." Helen Lee, another witness, present at the dance, stated that she left the defendant's home about 4 o'clock of the same morning for her house, which was in the rear of the home of defendant; that shortly after reaching her house she heard someone knocking at the back door of the defendant's house, and heard the defendant come out in the yard and say: "Why in the hell don't you go home? Everybody has gone"; that about five minutes after that she heard something more like a door slamming and got up and looked out the door of her home and, not seeing anything, returned to her bed; that after she got back in bed she heard someone groan; that at about 5 o'clock in the afternoon of the 16th of March she noticed a bullet lodged in the back door of the defendant's home; that after seeing the bullet she went to her home for supper, and, after finishing it, returned to the defendant's house and found that during her absence the bullet had been removed and the door covered with "white stuff." She described the sound she heard as something like a boom, "it didn't sound so much like a gun, it sounded like it was muffled," and she further testified that she heard the screen door at the back of defendant's house shut after she heard this muffled noise. At half-past 6 o'clock, or thereabouts, on the morning of said 16th of March the body of deceased was found in an alley some one hundred feet distant from the back door of the defendant's home. An examination showed that deceased had been shot straight through the body. The peace officers investigating the case found a Colt's 45 revolver fully loaded between the mattresses of defendant's bed. It further appeared that the deceased, who was about thirty-four or thirty-five years of age, had at one time served in the United States army, the date of such service not being given. On being questioned, the defendant at first denied any knowledge of the

affair, but subsequently stated the deceased had been accidentally shot by Carr with his (defendant's) gun. That he had given his gun to Carr with the request that he, Carr, look after "matters" for him during his temporary absence from the house, and that deceased had been killed accidentally while he, defendant, was away. He also stated that he had reloaded the revolver after Carr had shot the deceased with it. Finally, however, defendant admitted that he shot deceased with his, defendant's, gun, but asserted it was an accident. His story, told upon the witness-stand, is substantially as follows: That after he returned from the lodging-house, after leaving Carr, he went to bed and was just getting off to sleep when someone knocked and he asked "who is there"; no one answered, but knocked again; that he then got out of bed, put on his slippers and, without dressing, took his revolver, a single-action gun, cocked it, and went out the front door of the house, and thence around the house to the rear and "called out" to know who was there, and that deceased answered "It is Stub," it appearing that deceased was also known by that name; that he said to deceased, "What the hell are you doing here? Everybody has gone to bed"; that deceased said that he wanted another drink; that he told deceased he had no more liquor; that deceased insisted and that they talked back and forth; that deceased was standing on the top step of the steps leading to the back door with his back against the door and between the door and screen door and holding the screen door open. That he, defendant, stood on the ground with his revolver in his right hand hanging by his side; that deceased insisted on being given liquor and asked him what he had in his hand; that he, defendant, raised the gun to show deceased that it was a gun and not a bottle, and that deceased kicked the gun and it was discharged. That he, defendant, ran around the house and into the front door and deceased also ran. That he went through the house from the front door to the back door, stopping only a moment to look at his wife, who was lying intoxicated on the bed, and that when he got to the back door deceased had entirely disappeared. That he did not know that deceased was killed or that he had hit him until he heard it after the body was found.

All of the evidence produced at the trial upon the point, except that of defendant, and which testimony, aside from that of defendant, was that of experts, was to the effect that the bullet, which passed through the body of deceased, entered at the back and came out the abdomen, which is a very important circumstance, and in which, as we will subsequently point out, the defendant was vitally concerned. It should be stated, however, that one of the witnesses so testifying at the trial declared at the preliminary hearing that in his opinion the bullet had entered the *abdomen* and came out the *back* of the deceased. Defendant attaches considerable importance to this change of opinion, which we will presently consider.

[1] Counsel for defendant, in the discussion of his contention that the verdict is not supported by the evidence and in any event that the facts do not justify the imposition of the death penalty, forcefully urges that the shooting occurred at the defendant's own home, where the defendant had a right to be and where the deceased had no right to be at so early an hour in the morning hammering on the side of the defendant's house and upon the rear door thereof; that the most natural thing in the world for the defendant to do was to take his pistol and go out the front door, just as he did do, and then go cautiously around to the back of the house for the purpose of discovering who was disturbing the peace and quiet of his home at that "unseemly hour of the morning," and why it was being done; that the defendant and the deceased had not quarreled, and, so far as the record discloses, there had been no difference or ill feeling between them, and that there was present "no reason . . . why Ellis [defendant] would want to shoot Stannard [deceased]"; that they were, as claimed, on friendly terms is indicated by the fact that defendant loaned the deceased money with which to get his breakfast. To these considerations might be added that the statement that the defendant's account of the shooting and the incidents occurring in connection therewith is corroborated by other witnesses in the following important particulars, the knocking at the back door of defendant's house, the defendant going out of his house by the front door, the words addressed by defendant to the deceased when he first saw him at the kitchen door; the slamming of the screen door,

between which and the entrance or inner door, as we have seen, the defendant states the deceased was standing. But, aside from these facts and circumstances, there was evidence tending to support the verdict, and this court has uniformly held that where that is so we cannot disturb the verdict upon the ground that it is not sustained by the evidence, and the application of this rule is strengthened in a case where, as here, the trial court has refused a new trial. It is settled beyond controversy that the weight to be accorded the evidence is a question for the jury (*People* v. *Wilson,* 66 Cal. 370 [5 Pac. 624] ; *People* v. *McCurdy,* 68 Cal. 576 [10 Pac. 207] ; *People* v. *Mayes,* 66 Cal. 597 [56 Am. Rep. 126, 6 Pac. 691] ; *People* v. *Curry,* 103 Cal. 548 [37 Pac. 503] ; *People* v. *Musumeci,* 51 Cal. App. 454 [197 Pac. 129].) In *People* v. *McCurdy, supra,* a case wherein the extreme penalty of the law was imposed upon the defendant who had been convicted of murder in the first degree, this court said: "The situation of the parties, the surrounding circumstances, the incentives to the crime, and all of the probabilities, were questions peculiarly within the province of the jury to determine. There being evidence sufficient to support the verdict, we are not at liberty under the well-established rules of this court to interfere with such verdict upon the ground that it is contrary to the evidence."

[2] Defendant's next contention is that the trial court "committed reversible error in permitting the prosecution, over the objection of the defendant, to introduce testimony tending to prove defendant guilty of a crime other than that with which he was charged." It was proven that alcoholic drinks were served by the defendant during the evening and that the deceased had partaken thereof, and that he paid the defendant for the same, and it is the admission of this testimony, particularly as to payment, that defendant claims was error. The question arose in this wise: A witness for the people was asked by the district attorney if the defendant took pay for the liquor which he furnished deceased, and the witness answered that he did. No objection was then made to the question. Some little time after the attorney for the defendant stated that the question was asked and answered so quickly that he did not have an opportunity to object, and asked the permis-

sion of the court to make an objection at that time and to move to strike out the answer "on the ground that it was incompetent, irrelevant, and immaterial, and had nothing to do with the issues of the case." The motion to strike out was granted and the jury instructed to disregard the testimony of the witness "to the effect that the defendant took pay for the liquor which was furnished by him." After further discussion the court announced it would change its ruling, and permit the testimony to stand "at the present time," subject to the right of the defendant to renew his motion to strike at the close of the prosecution's case, the court further stating "the jury will understand that it [said testimony touching payment for the liquor] is not admitted for the purpose and it is not to be considered by the jury for the purpose of tending to show a separate offense, the defendant is charged here with murder and not being charged with any other offense." The motion to strike out was not renewed by defendant, but we regard this as of little consequence, for in our opinion the motion as made and denied sufficiently raises the question. We can discover no reversible error in this ruling. It is the law that where the proffered evidence directly throws light upon the facts of the issue being tried, it is admissible although it proves another offense as well. (*People* v. *Suesser*, 142 Cal. 354 [75 Pac. 1093]; *People* v. *Craig*, 111 Cal. 460 [44 Pac. 186]; *People* v. *Rogers*, 71 Cal. 565 [12 Pac. 679]; *People* v. *Miller*, 121 Cal. 343 [53 Pac. 816]; *People* v. *Smith*, 9 Cal. App. 644 [99 Pac. 1111].) In *People* v. *Suesser, supra* (page 363), this court said: "It is of course true that evidence . . . as to other offenses, is not admissible against a defendant unless there is a sufficient connection between the facts sought to be proved and the particular act under investigation. Where the proffered evidence is relevant to the issue being tried, the mere fact that it shows . . . the commission of other offenses by the defendant, is no legal objection to its admission. This is recognized by all the authorities." In *People* v. *Smith, supra* (page 647), it is declared: "Where the proffered evidence directly throws light upon the facts of the issue being tried, it is admissible although it proves another offense as well." In *People* v. *Sanders*, 114 Cal. 216, 230 [46 Pac. 153, 157], this court gave expression to the follow-

ing: "If the evidence of another crime is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence, simply because it involves the commission of another crime. (*People* v. *Tucker,* 104 Cal. 440 [38 Pac. 195].) The general tests of the admissibility of evidence in a criminal case are: 1. Is it a part of the *res gestae?* 2. If not, does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not." Applying these principles to the present case, we have the following: Evidence had been introduced showing that defendant was serving liquor during the evening and hence proof that the deceased paid for the liquor served him and did not receive it as a gratuity would tend to establish knowledge on the part of deceased that liquor could be purchased at the defendant's home, which would be a circumstance in finally determining whether the defendant was justified in believing that the person knocking on the side of his house and on the rear door thereof, intended to assail his home and commit a felony, and was not desirous of purchasing more liquor, as well at to explain Stannard's presence there. In fact, as the defendant subsequently testified, the deceased said before the shooting, he wanted more liquor, "another drink," and the evidence furnishes no other reason for the presence of the deceased at defendant's kitchen door on the morning of the day of the shooting. In our opinion, the circumstances appearing in the record show a relevant connection between the selling of the liquor, the cause of the deceased's return to the house, and the shooting. Furthermore, the jury was entitled to know all that transpired between the deceased and the defendant from the time that the former entered the house of the latter until and including the shooting.

Defendant in his brief cites a large number of cases, most of which are from this court, which he affirms support his contention that the evidence objected to was inadmissible. We have carefully examined these authorities and in our opinion none of them is in conflict with the

rule above announced, or applicable to the facts of the
instant case. They do, however, uphold and apply to the
facts with which they respectively dealt, that other rule,
equally well grounded in the law, that evidence of another
and distinct criminal charge *in no way connected with the
one before the court is not admissible.* Such was the ruling
in *People* v. *Vidal,* 121 Cal. 221 [53 Pac. 558], *People* v.
*Hartman,* 62 Cal. 562; *People* v. *Glass,* 158 Cal. 650 [112
Pac. 281], *People* v. *Arlington,* 123 Cal. 356 [51 Pac.
1003], which cases are illustrative of all the authorities
upon the point to which defendant refers us. Moreover,
in the case at bar the court expressly told the jury that
the evidence in question was not admitted for the purpose
of showing a separate offense. Counsel for defendant, in
his very able brief, declares that the "defendant did not
claim that he shot the deceased because he demanded en-
trance to his home, or because he was attempting to effect
an entrance. The only defense he made was that the
shooting was wholly accidental," but even so, it is clear
that defendant went around to the rear of his home to
ascertain who was knocking at his door. He testifies,
"Someone knocked, and I says, 'Who is there'; no one
answered and they knocked again; I got up and picked
up a pair of house shoes and picked a pistol up and went
out around the front door and I went around the corner,
I says, 'Who in hell is out there?' . . . and he called,
he said it was Stubby [deceased]," in connection with
which testimony the jury was entitled to consider all that
had transpired that night between the deceased and de-
fendant when determining the truth of said claim that the
shooting was accidental, which their verdict indicates they
did not believe. Furthermore, while the defendant did not
testify that he received pay for the drinks he served the
deceased on that fatal night, he did upon his direct exam-
ination state that when, after reaching the back of his
house he inquired "who in hell is out there," the deceased
replied, "I want something to drink." The following is the
defendant's statement of what occurred: "I says, 'I haven't
got nothing,' he says, 'Let me have a drink,' and I says,
'Everybody has gone,' I says, 'Go home and go to bed';
he says, 'Give me another drink'; he was standing between
the screen and the door; I pulled the screen back and

I says, 'I haven't anything to drink'; he says, '*Give me just one more*'; I says, 'If I had it you would be welcome.'" Upon cross-examination the defendant testified: "He [deceased] says, 'I want something to drink.' I says, 'I *haven't got any more.*'" From the defendant's own statement it clearly appears he was serving intoxicating liquors, and so intimately connected is that circumstance with the appearance of the deceased at defendant's rear door, that we think it was competent to prove whether such serving to the deceased was an act of hospitality or for compensation. If for compensation the defendant might reasonably expect that those whom he had thus served would assume it could be purchased at any time and might return for that purpose. Anything so connected with the alleged killing, in point of time and character, as to explain how and why it was committed, was admissible, and for that reason the prosecution was entitled to introduce evidence tending to show that it was because the deceased was demanding more liquor, intimately connected with which demand was the fact that the defendant had a few hours previously furnished him, deceased, liquor, for which he had paid defendant, and which in itself tended to justify deceased's request, that the defendant shot the deceased.

[3] Defendant further affirms that the trial court committed reversible error in permitting the prosecution, over his objection, to introduce testimony showing that he escaped from the county jail after he had been confined therein for a considerable time, the purpose of the testimony being to prove flight, and in giving the following instruction: "The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that the defendant was arrested for the crime charged in the information, and that after being informed of the cause of his arrest, escaped or attempted to escape from the person having him under arrest, it is a circumstance that the jury may consider in determining his guilt or innocence."

Defendant made no attempt to escape at the time of the shooting, but remained in Oxnard until his arrest on the evening of March 17, 1921, but after such arrest and on April 9, 1921, he made his escape from the county jail of Ventura County. The testimony concerning such escape

is rather meager. The record discloses the following: The under-sheriff of Ventura County, a witness on behalf of the prosecution, was asked by the district attorney if the defendant escaped from the county jail, which question was objected to on the ground that it was leading, incompetent, irrelevant, and immaterial; the court in ruling said: "It is leading . . . however the objection will be overruled." The answer, which defendant moved to strike out, and which motion was denied, was in substance that the defendant escaped on April 9, 1921, and that he was recaptured on April 14, 1921, at San Bernardino.

Defendant correctly concedes that the "proof of flight is generally admissible upon the theory that it has a tendency to show consciousness of guilt," but contends that the proof must be confined to "flight immediately or soon after the commission of the crime and before the defendant has been apprehended and taken into custody, or at least before he has been confined for some time in jail," but refers us to no authority sustaining this position. The contention cannot be upheld. In *People* v. *Cole,* 141 Cal. 88 [74 Pac. 547], the following was quoted from the opinion of Judge Cooley in *People* v. *Arnold,* 43 Mich. 303 [38 Am. St. Rep. 182, 5 N. W. 385]: "It was never doubted that the conduct of a suspected party when charged with a crime may be put in evidence against him when it is such as an innocent man would not be likely to resort to. . . . It may be shown that the accused fled to escape arrest, or broke jail or attempted to do so, or offered a bribe for his liberty to his keeper." In *People* v. *Crowley,* 13 Cal. App. 322, 325 [109 Pac. 493, 495], it is said: "That an attempt to escape is a circumstance proper to be shown and considered by the jury is put beyond controversy by the authorities." There can be no well grounded difference, so far as the act evidences consciousness of guilt, between flight before and after arrest. (*People* v. *Welsh,* 63 Cal. 167; *People* v. *Bushton,* 80 Cal. 160 [22 Pac. 127, 549]; *People* v. *Flannelly,* 128 Cal. 83, 87 [60 Pac. 670].)

We do not think the instruction touching the evidentiary effect of the escape of defendant after his arrest is open to the criticism which defendant directs against it. The jury was correctly told that it was "a circumstance" which

it might consider ''in determining his [defendant's] guilt or innocence,'' and it was in nowise misleading or uncertain or ambiguous, and substantially conformed to the law, as above stated.

[4] Defendant strenuously insists that the trial court erred in permitting two witnesses for the people, Shilling and Kemper, claimed to be experts in the use of firearms, over his, defendant's objection, to respectively give their opinion as to the point of entrance and exit of the bullet which killed deceased, and in permitting Doctors Homer, Swift, and Lewis, also witnesses produced by the prosecution, to give their opinions touching the same matter. It is contended by defendant that the entrance and exit of the bullet was not a question for expert testimony, but one of fact to be solely determined by the jury upon the evidence adduced. We are unable to give our approval to this contention. It is obvious that it is a pivotal point in the case in that it directly bears upon the question whether the shooting admitted by the defendant was, as he claims, an accident or done with ''malice aforethought.'' If deceased was shot in the back it would tend to disprove and contradict the defendant's account of what occurred between him and the deceased at the time of the shooting, and, upon the other hand, if the bullet entered the abdomen it would strongly support the claim of the defendant that the shooting was accidental.

We have given the authorities cited by defendant as sustaining this contention a careful examination, and none of them, in our opinion, is analogous to the one at bar, or controlling here. The rule of evidence that they announce and correctly apply to the facts they severally presented is not applicable to the facts of the instant case. Moreover, the point advanced is definitely determined adversely to defendant in *People* v. *Phelan,* 123 Cal. 551, 566 [56 Pac. 424, 430], where it is said: ''It is claimed that the superior court erred in allowing Doctor Iglick to give his opinion as an expert upon the question of exit and entrance of the bullet. The doctor had been a practicing physician and surgeon for fifteen years, but had never had but one case of gunshot wound, and in that case there was only a wound of entrance; but he had taken a regular course of lectures on medical jurisprudence, had studied the standard authori-

ties on the subject of gunshot wounds, had read the reports of our army surgeons on the subject, and had himself conducted the autopsy in this case, so that he was not only able to express a general opinion in answer to a hypothetical question, but was able to state the particular grounds upon which his opinion in this case was founded. There was, we think, a sufficient foundation laid to warrant the court in admitting his testimony. *Its value was a question for the jury.*" (The italics are ours.)

The qualifications as experts of each of the witnesses produced were sufficiently established. Doctor Homer, who made the post-mortem examination, had been a practicing physician for about nine years, had had considerable experience with wounds, and during the world war was a member of the expeditionary forces in Scotland. He examined the body of the deceased, and in stating the result of such examination said: "I went over the body externally first, and found nothing of any wound excepting a puncture wound which I took to be a gunshot wound in the abdomen and an inch and a half below the lower border of ribs, an inch to the left of the mid line through the abdomen. Another hole in the back, slightly to the right of the vertebra between the first and second lumbar vertebrae. . . . I would judge that it [course of the bullet] was almost straight through [the body]." After giving a detailed description of the wound, and the condition of the clothing worn by the deceased at the time of the shooting, so far as its condition might indicate the point of entry and exit of the bullet, he stated that in his opinion it entered the back. Doctor Smith, another expert, said he had been a practicing physician for eleven years and served in his professional capacity in our army in France, and while in that service saw from sixty to 120 gunshot wounds a day. He also examined the body of the deceased and, in his opinion, "undoubtedly the bullet went in the back and came out through the abdomen," giving his reason for such opinion. Doctor Lewis, a physician and surgeon of fourteen years' experience, and who was a major in the medical corps of the American army in France, testified that he had made a careful examination of the clothing of deceased, which had been received in evidence, and gave as his opinion, which was based entirely upon such examina-

tion of the clothing, that "the point of entrance of the bullet was in the back, and the exit in the front." Doctor Lewis stated further, that when in the service he drew his conclusions as to the point of entrance of a bullet "more often from the clothing" the wounded man wore than from the condition of the wound. C. J. Shilling, called by the prosecution, testified that for twelve years he had been special representative of the Remington Arms Company, and prior to that time his profession was that of an "expert shot"—"an exhibition shot"—and that he had handled all lines of small firearms, revolvers, shotguns, rifles, and pistols, including a 45 Colt's revolver, and had occasion to observe the effect of firearms on clothing, and had been an expert witness in a murder case in San Francisco, in connection with which he saw experimental work performed with a pistol. He had seen experimental work with a pistol, rifle, and shotgun at "close range," as close as within six inches, practically at the muzzle; that the pistol used in such experimental work was a 38 Smith and Wesson Special and 150 grain lead ball; that he did not know what kind of a bullet the deceased was shot with. After further testimony tending to qualify the witness as an expert, he stated: "To my mind there is no doubt but what the bullet entered at the back, the smaller hole, and came out at the front of the coat, or the larger hole," giving his reason for his opinion, which need not be repeated here. William T. Kemper, "a cleaner and dyer," also an expert witness for the prosecution, testified that his father taught him to shoot when he was six years of age, and from the time he was about twelve years old to the present he did shooting for amusement and exhibition purposes; that he had three years' experience in the regular army, where he had occasion to shoot almost every day in the week; that he left the army in 1904; that he had cleaned a number of suits since he had been in business, which had been penetrated by bullets, and had "made experiments" on canvas and paper and shooting at cloth "to see how far the charge of powder can be consumed"; that he then had two guns in his possession similar to the one placed in evidence by the prosecution and with which it is claimed the defendant shot deceased; that he had shot with them, using lead bullets; that in the experiments, which he testified he had made,

where pistols were used "they were fired from twenty to seventy-five yards," and his opinion was that the bullet entered the coat of deceased from the back. As we have said, in our opinion all of this evidence was admissible, its value and weight being a matter for the jury. The experts in the use of firearms, and the doctor who examined the clothing only, were as competent to give their opinion as to the point of entrance and exit of the bullet, which passed through the body of deceased, based upon their experience and observations, the character and extent of which has already been herein stated, as Doctors Homer and Smith, whose opinions as experts were admissible under the authority of *People* v. *Phelan, supra. People* v. *Wong Chuey,* 117 Cal. 624, 629 [49 Pac. 833], is also in point. There the surgeon who attended the deceased prior to his death testified that he. had examined the gunshot wound which caused his death, and had examined gunshot wounds in the past, and taken bullets therefrom, and knew the size of the bullets making these various wounds. Under objection he then testified that in his opinion the wound upon deceased was inflicted by a 41 or 44 caliber bullet, and this court held there was "no substantial objection to this evidence." It is obvious that the witness in the Wong Chuey case testified primarily not as a surgeon but because he was an expert in determining from an examination of a gunshot wound the size of the bullet with which it was made, just as the firearms experts and doctors in this case, from an inspection of the holes in the wearing apparel of deceased produced by the fatal bullet, were able to and did give an opinion touching the point of entry and exit of such bullet.

[5] Defendant, as already noted, complains that Doctor Homer testified at the preliminary examination that in his opinion the bullet entered the abdomen of deceased, but upon the trial changed such opinion and stated that he believed the bullet entered the back of the deceased, stating his reasons for such change. The fact that the doctor had, between the date of the preliminary examination and his testifying at the trial, changed his mind as above stated, was not a ground for excluding his testimony, and defendant does not so contend; at most, it merely affected the

weight of his evidence, which it was the province of the jury to determine.

[6] It is further urged that the experts should have been asked a formal hypothetical question rather than permitted, as they were, to base their opinion upon what they gathered from an examination, where that was done, of the body and clothing of deceased, or from an inspection of the clothing without an examination of the remains. We can see no substantial objection to the method pursued, inasmuch as such expert testimony was of necessity based either upon an actual examination of the body of the deceased or of the clothing he wore at the time of the shooting, or both. From some viewpoints, under the circumstances appearing here, the method followed as a means of placing the court and jury in the possession of the facts, which is the object of all trials, was more effectual than the response to a hypothetical question would have been. Defendant correctly affirms that all the expert testimony touching the point at which the ball from defendant's weapon entered the body of deceased, which alone rested upon an examination of his wearing apparel, was based upon an inspection of such apparel, made for the first time at the trial, and that the time which had elapsed between that date and the shooting had wrought a material change in the condition of such clothing, especially the parts pierced by the bullet. This was also a matter involving the weight of the evidence, which was for the jury to consider and decide. In this connection it should be said, the person who removed the clothes from the body of deceased testified that at the time of the trial they were in the same general condition, except as to dryness, as they were when he removed them, and there is no testimony to the contrary.

*People* v. *Le Doux*, 155 Cal. 535, 554 [102 Pac. 517], is not in conflict with the preceding views, and is not an authority disapproving the method of presenting the expert testimony under the circumstances appearing in the instant case. In the Le Doux case the prosecution addressed to the physicians called as expert witnesses the preliminary question whether they had heard the testimony of certain other witnesses at the trial. Upon giving an affirmative answer they were then asked the following question: "Now,

Doctor, assuming each and all of the facts and circumstances testified to by these gentlemen I have named as true, what in your opinion was the cause of the death of A. N. McVicar, the deceased person mentioned in this case?'' And this court held that the trial court erred in overruling an objection to such question. It is obvious that this method of presenting expert testimony was essentially different from the one adopted here. In the present case, the facts upon which the opinions were based were in some instances testified to by the witness expressing the opinion, and in any event were simple, and many of them not a matter of memory or description but actually in plain sight of the jury—as open to their inspection as they were to the expert. In the Le Doux case the court said (page 555): ''In thus pointing out what we conceive to be the best method for obtaining the expert opinion of a witness, we would not be understood as saying that every departure from that method involves error, necessitating the reversal of a case. Cases may arise where the facts upon which the opinion is sought are simple, salient, and few. If it be made to appear that the expert has heard the testimony by which those facts have been presented, it would not necessarily be held ground for reversal that he was asked to express his opinion upon those facts, without a restatement of them.''

[7] Defendant presses upon our consideration his claim that the verdict, ''carrying with it as it did the death penalty, must have been the result of mental excitement, passion, and prejudice, . . . materially aided by a deep-seated, subconscious prejudice against a negro defendant.'' We are unable to find anything in the record supporting such contention; to the contrary, every indication is that the defendant had a fair trial. The mere fact that the defendant is a colored man, charged with having killed a white man, falls far short of establishing prejudice and passion of a character warranting setting aside the verdict upon those grounds. Moreover, the jury was, at defendant's request, instructed ''that the law knows no creed or condition, no color, no nationality, every defendant, whatever his race, color or condition, . . . stands equal before the law and should be tried with perfect impartiality,''

and there is present here no circumstance indicating that the jury disregarded this admonition of the court.

[8] Defendant earnestly protests that the facts and circumstances of this case, as revealed by the record, disclose and show that the penalty imposed is severe. Every person guilty of murder in the first degree is punishable either by death or imprisonment for life at the discretion of the jury trying the same. (Pen. Code, sec. 190.) The question, which punishment shall be inflicted, is not to be decided by the jury until after it has become satisfied that the defendant is guilty of murder in the first degree. If the evidence supports that conclusion, it will support either punishment by death or imprisonment for life. The appellate courts cannot review the decision of the jury in the matter, nor consider whether or not the lighter punishment should have been inflicted. If the reviewing court is satisfied that there is sufficient evidence to justify a verdict of murder of the first degree, its inquiry on that point is ended.

The gravity of the case has moved us to give painstaking consideration to the points advanced by the defendant. The instructions of the court to the jury were full and clear and in all respects, so far as we can discover, fair to defendant. Failing to find any reversible error in the record, and there being sufficient evidence to sustain the verdict of the jury, the judgment and order denying defendant's motion for a new trial must be, and each of them is, affirmed.

Lennon, J., Lawlor, J., Wilbur, J., and Shaw, C. J., concurred.