[Crim. No. 1643.   Third Appellate District.—November 21, 1938.]

THE PEOPLE, Respondent, v. MITCHELL D. SIDERIUS
et al., Appellant.

Wallace Shepard and R. C. Fleming for Appellants.

U. S. Webb, Attorney-General, and Gordon S. Hughes, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The appellants were jointly indicted and convicted of grand theft for stealing from a quartz mine in El Dorado County a large quantity of gold ore.

It is contended the verdict and judgment are not supported by the evidence chiefly for failure to prove the *corpus delicti* and to adequately corroborate the testimony of accomplices to the crime as required by section 1111 of the Penal Code. It is also asserted the court erred in permitting argument before the jury regarding the competency of evidence and in giving to the jury certain instructions.

The defendants were charged in five different counts with grand thefts committed on various dates from December 10, 1937, to February 7, 1938, by stealing from the Black Oak Mine in El Dorado County, where they were employed, large quantities of gold-bearing ore. Upon the completion of the evidence at the trial, the first and second counts were dismissed. The defendants were acquitted of the charges contained in the third, fourth and sixth counts. Both defendants were found guilty of the charge contained in the fifth count in which they were accused of stealing from Russell J. Wilson and E. W. Wilson, the owners of the Black Oak Mine in El Dorado County, on January 24, 1938, a quantity of gold ore of the value of $2,200.

The evidence discloses the following facts: Russell J. Wilson and his father, E. W. Wilson, owned and operated the Black Oak Mine, which is located in Garden Valley, eleven miles from Placerville in El Dorado County. The defendants and some thirty-five other men were employed in that mine during 1937 and until March, 1938. During that period of time several of the employees were engaged in the too-common practice of stealing ore which, in mining vernacular, is termed "highgrading". (*Atolia Min. Co.* v. *Industrial Acc. Com.*, 175 Cal. 691 [167 Pac. 148]; Rickett's Mining Law, par. 668.) The defendants conspired with two of the employees named William L. Davey and Roy L. Davenport to steal gold ore from the mine with the agreement that they would divide equally the proceeds of sales of their highgrade quartz. For several months until about March, 1938, they successfully carried on their illicit enterprise of stealing ore from the mine. During that period of time they stole and disposed of several thousand dollars worth of ore. At the time they were apprehended the defendants had in a safe deposit box three or four thousand dollars derived from sales of ore from the mine. They followed the practice of taking the ore in sacks from the shaft during the night-time and of

conveying it to the home of Dudley G. Davenport, the father of Roy. His residence was situated about a mile from the mine. Here the ore was either temporarily buried in the ground or hidden in a tool-box in a shed until it could be reduced and marketed. On the Davenport place they maintained a mulling machine and apparatus by means of which they crushed the ore and extracted the quicksilver. The ore was then hauled to Jackson in the adjoining county of Amador, some thirty miles distant, and sold to a "bootleg dealer" by the name of Antonio Garcia.

During this same period of time other employees of the mine were also engaged in systematically stealing ore. They all had knowledge of the defendants' thefts, but, except for Davenport and Davey, they did not participate with them. They conducted their own separate enterprises.

Some time in February, 1938, the robberies of the mine were discovered by the owners and an investigation was instituted. The entire plot was disclosed. Sheriff Smith found several sacks of ore buried on the Davenport premises. He also discovered the mulling machine and other evidence of the perpetration of the thefts of highgrade ore. Mr. Russell J. Wilson identified the ore which was contained in the buried sacks as mineral quartz from his mine. Several indictments followed. In separate indictments, seven of the employees of the Black Oak Mine, besides the defendants, were charged with grand thefts of ore. Among the other employees who were separately indicted were Roy L. Davenport and William LeRoy Davey, the two associates of the defendants. Five of these other employees, including the defendants' coconspirators Davey and Davenport, pleaded guilty to the offenses with which they were charged. All of them testified against the defendants at the trial. Davenport and Davey related in detail the circumstances of their agreement with the defendants to steal and market ore from the mine and to share equally the proceeds of such sales. They told exactly how the plot was carried out.

Regarding the particular theft of which the defendants were convicted, Roy Davenport testified that on January 24, 1938, they took a quantity of ore from the mine, and that William Davey in company with one of the defendants, hauled it to the Davenport home, and that Dudley Daven-

port, his father, in company with the defendant, Siderius, then took it on to Jackson and sold it to Antonio Garcia for $2,000. He said that one of the defendants afterwards paid him "close to five hundred dollars" as his share of that sale.

Gordon Davenport, the younger brother of Roy, who was not employed in the mine, but was engaged in the forestry service, testified to seeing the mulling press used on his father's premises. He told of the defendants, Siderius and Field, bringing to his father's home several sacks of ore upon different occasions, and he said that these sacks were either buried in the ground or hidden in the tool-box in a shed. He also testified that he accompanied his brother Roy on two trips to Jackson, when he hauled and sold to Garcia several sacks of ore. Regarding the amount of money which was paid to the defendants for the ore which they stole on January 24th, Gordon said: "Q. How much was received at that time? . . . A. It was over twenty-one hundred dollars." This confirmed what Roy said about receiving "close to five hundred dollars" for his one-fourth share of the proceeds of that sale.

The father of Roy Davenport testified to the presence of stolen ore on his premises, which was either buried in the earth or concealed in the tool-box. He also told of seeing the defendant, Siderius, assisting in the extraction of quicksilver from the ore. He saw them weigh the amalgam in his very presence. He also told of accompanying the defendant, Siderius, "sometime after Christmas" with a load of ore, to the rendezvous of Garcia, where it was crushed and sold.

Harold H. Hardy, an acquaintance of Siderius, who was neither an employee in the mine nor implicated in the thefts, testified that he had a conversation with that defendant while the investigation of the thefts in the mine was being conducted. Siderius then asked him "how the investigation was going". Hardy said the defendant told him they had between three and four thousand dollars in a safe deposit box and he wanted to know what he thought he should do with the money. This was an admission by Siderius that he had several thousand dollars, the proceeds of sales of the stolen ore, hidden in a safe deposit box, which he feared the officers might discover and the possession of which he thought might incriminate him.

Several other witnesses, who were not accessories to the crime of which the defendants were convicted, related facts and circumstances at the trial, which strongly corroborate the testimony of Davenport and Davey. The testimony of the accomplices to the crime was sufficiently corroborated to conform to the requirements of section 1111 of the Penal Code.

Antonio Garcia was called as a witness, but he refused to answer any material questions regarding the thefts on the ground that his testimony might incriminate him. Neither of the defendants was sworn in his own behalf. At the close of the case three counts of the indictment were dismissed. The defendants were acquitted on two other counts. They were both found guilty of grand theft as charged in the fifth count. A motion for a new trial was denied. From the judgment of conviction and from the order denying their motion for a new trial, the defendants have appealed.

■ There is an abundance of competent evidence to sustain the judgment against the defendants. No impartial person can read the record without being thoroughly convinced the defendants were guilty of participating with Roy Davenport and William Davey in a systematic agreement and plot pursuant to which they repeatedly stole large quantities of gold-bearing ore from the Black Oak Mine and sold their plunder to Antonio Garcia at Jackson, dividing the proceeds of sales ''four ways'' between them. The evidence of the guilt of the defendants of the theft of ore on January 24, 1938, of which they were convicted, and its sale to Garcia for a sum of money in excess of $2,000 is very convincing. There was no miscarriage of justice in the present action.

■ The *corpus delicti* was sufficiently established in this case. To prove the *corpus delicti* in larceny cases it is only necessary to show that the property is taken from the possession of the owner without his consent and that it is removed with a felonious intent. (17 R. C. L., p. 64, sec. 69.) There is ample evidence in this case to show that gold-bearing ore was taken from the Black Oak Mine on January 24, 1938, without the consent of the owners thereof and with the intention of stealing it; that it was transported to the Davenport premises and that William Davey in company with Siderius, one of the defendants, hauled it to Jackson, where it was

sold. Roy Davenport testified to those facts. He said he saw the particular ore in question at the mine around the 24th of January, 1938. Regarding that subject he testified as follows:

"Q. Where did you first see that ore? A. In the mine. Q. And where did you see it next? A. Down at my place. Q. And who brought it there? A. Bill Davey. Q. And what was done with it after it was brought to your place? A. It was taken over to Jackson and sold. . . . Q. Who went with him (Roy's father) do you know? A. One of the two defendants went with him. . . . And did you receive anything from that ore? A. Yes sir. Q. Who gave it to you? A. It was one of the two defendants. . . . Q. How much did you receive? A. Close to five hundred dollars."

Since Roy was one of the men who associated with the defendants in the plan to steal and sell the ore upon an agreement to divide the proceeds equally between them, this furnishes evidence of the fact that that particular load of ore was sold at Jackson for at least $2,000.

Russell J. Wilson, one of the owners of the mine, testified that the ore was taken from the mine without their knowledge or consent. He absolutely identified the ore which the sheriff discovered in sacks buried on the Davenport place, as ore from the Black Oak Mine. This evidence was corroborated by other facts and circumstances related by witnesses who were not accessories to the crime, sufficient to meet the requirements of section 1111 of the Penal Code. The foregoing evidence furnishes ample proof of the *corpus delicti*.

■ The testimony of an accomplice may be considered in proof of the *corpus delicti* provided it is adequately corroborated by facts or circumstances sufficient to meet the requirements of section 1111 of the Penal Code. (*People* v. *Frazer,* 80 Cal. App. 464, 468 [252 Pac. 633]; *People* v. *Bonilla,* 124 Cal. App. 212, 215 [12 Pac. (2d) 64]; *People* v. *Sandow,* 133 Cal. App. 559 [24 Pac. (2d) 521]; *People* v. *Davis,* 210 Cal. 540, 555 [293 Pac. 32].) It is true that the *corpus delicti* may not be established by mere extrajudicial admissions of an accused person. (*People* v. *Hudson,* 139 Cal. App. 543 [34 Pac. (2d) 741].) In the present case, however, the proof of the *corpus delicti* is not dependent upon extrajudicial admissions of the defendants.

██ The appellants strenuously insist that because the record shows only that the stolen ore was worth $2,000 at Jackson in the adjoining county of Amador, there is no evidence of its market value at the mine from which it was taken, and that there is, therefore, no evidence that the offense constitutes grand theft of personal property of the value of $200 or more. There is no merit in that contention. The record contains sufficient evidence that the value of the ore which was stolen from the mine January 24, 1938, was far greater than $200, and that it, therefore, constituted grand theft according to the provisions of section 487 of the Penal Code. The evidence is undisputed that the particular ore which is involved in this appeal was sold immediately after the theft occurred to Garcia at Jackson for more than $2,000. Russell Wilson, one of the owners of the mine, testified that the shaft was located in Garden Valley about eleven miles from Placerville in El Dorado County. Since both Placerville and Jackson are incorporated towns, the court will take judicial notice of their locations. (*People* v. *Padilla*, 86 Cal. App. 95 [260 Pac. 394] ; sec. 1875, subd. 8, Code Civ. Proc.; 23 C. J. 85, sec. 1869.) It thus appears that Jackson, where the ore was sold for $2,000, is located in Amador County, adjoining El Dorado County, about thirty miles from the mine where it was stolen. There is no evidence that it was worth less than that sum at the mine. Gold ore has a fairly fixed market value. This ore was sold as stolen property to a "bootleg dealer". It may not be reasonably presumed he gave ten times its value at a market thirty miles away. In the case of *State* v. *Brown*, 55 Kan. 611 [40 Pac. 1001], evidence of the value of stolen wheat at a town in an adjoining county to which it was hauled for sale, was held to adequately fulfill the rule that in larceny cases the value of the property must be established in a market at or near the place where it was stolen. The court there said:

"A thief is stealing the property from the time he takes it up until he lays it down, although several counties may intervene between these points; and this principle is very generally recognized in the criminal jurisprudence of this country."

To the same effect it is likewise said in 17 Ruling Case Law, page 66, section 71, that:

"The market value of the property at the time and place of the theft is the proper value to be proven and not the value at another place to which it is taken. However, as the act of the thief in stealing property is continuous from the time he takes it until he lays it down or disposes of it, evidence of the market value thereof at the place to which it is taken and sold would seem to be admissible."

In 36 Corpus Juris, page 883, section 449, it is said, with respect to establishing the market value of stolen property:

"If the property has a market value the evidence must be limited to such value, at the time and place of the offense *or at a nearby place where the thief sold it.*"

At least, we assume, that if the property is immediately taken for sale to a town so near the place from which it is stolen that it is reasonably probable the market value would be the same in both localities, and there is no evidence to the contrary, for the purpose of determining the degree of the crime the price for which property having a stable value is sold may be deemed to be the market value thereof at the place of the theft.

The rule which requires the market value of stolen property to be ascertained "at the place" where the theft is committed, should receive a reasonable construction. Rules of law are founded on sound reason to procure justice. To hold that the term "at the place" meant that the value must be fixed at the exact spot where the crime was committed would be unsound and it would defeat justice. Such construction in the present case would require the value of the ore to be determined at the 1400-foot level of the mining shaft from which it was removed. That would be absurd. Staple articles, like wheat and corn, or even gold ore, have fairly fixed and uniform values throughout districts of considerable radius. The value of such property cannot be confined to a particular valley, town or zone which may be described by metes and bounds. It is apparent that the place which determines the market value of stolen property, for the purpose of fixing the degree of the crime, is necessarily somewhat flexible and uncertain in extent, and that in defining its radius, the character of the property, the sta-

bility and uniformity of its price and the circumstances of the particular case, should be considered. There might be no market value for certain articles at the precise place where they are stolen. It is just common sense to say that if a thief stole a load of wheat or gold ore and hauled it thirty or even a hundred miles to sell it to a confederate, whether his destination was within the county where he stole the property or beyond its border, that, in the absence of evidence to the contrary, the price which he received for the stolen property adequately fixes its value *at the place of the theft*. We conclude the market value of the ore was sufficiently established to meet the requirements of the law.

The case of *People* v. *Ciani*, 104 Cal. App. 596 [286 Pac. 459], upon which the appellants rely to support their contention that there is no evidence in this case of the market value of the stolen ore at the mine, may be readily distinguished. That case cites several authorities in support of the generally accepted rule that in case of larceny of personal property, when its value is an issue from which the degree of the crime must be determined, the market value at or near the time and place of the theft must be controlling.

In that case it appears the defendant was charged with stealing 110 boxes of raisins, and he sold them at Fresno, twenty-eight miles from the place where they were stolen, for $216.67. This was a mere trifle over the necessary value of $200, which constitutes the offense of grand theft. The evidence in that case affirmatively showed the raisins were worth less than the selling price of $216.67, at the place where they were stolen. The court said in that regard:

"One of the witnesses for respondent testified that the price would necessarily be less at Stellianos Ranch than in Fresno."

There was no evidence to the contrary in that case. That judgment was reversed and the trial court was directed to render judgment against the defendant for petit larceny on the theory that there was no evidence that the raisins were worth $216.67 at the place where they were stolen. In truth, it affirmatively appeared they were worth less than that sum at the ranch. How much less they were worth at the ranch does not appear.

In the present case there is no evidence the ore was worth less at the mine than $2,000. There can be no reasonable doubt it was worth far more than $200 at the mine. The only evidence in the record is that it was worth over $2,000 at Jackson, thirty miles from there. That was the price paid for the ore by a bootleg dealer who knew he was buying stolen property. Undoubtedly the market value of the ore was much greater than the price paid for it. Gold ore has a fairly stable market price. It is absurd to assume its value would not be substantially the same within a radius of a few miles. In the absence of evidence to the contrary, we are satisfied that the price of ore at Jackson where it was sold is at least a *prima facie* showing of its value at the mine in an adjoining county some thirty miles distant, for the mere purpose of fixing the degree of the crime.

The appellants contend the court was guilty of prejudicial misconduct in permitting arguments to be made in the presence of the jury regarding the competency of evidence tending to show a conspiracy to steal the ore. There is no merit in this contention. The judge was entirely fair and impartial in his conduct at the trial. He was very careful not to express his opinion regarding the guilt or the innocence of the defendants. He refrained from saying anything which might prejudice their cause. He was unusually discreet and cautious in his trial of the case. In ruling upon the objections to the questions interposed to evidence of accessories regarding the conspiracy, it was necessary and proper for the judge to give the reasons for his decisions even though they involved an application of the law to the proffered evidence. But the court did not discuss the facts nor make any reference to the weight or effect of such evidence. Moreover, after the judge passed upon the questions of law involved in the objections, he voluntarily admonished the jury to disregard the discussions of law. He said:

"The jury will keep in mind that these discussions between court and counsel as to the admissibility of testimony are not evidence at all. The jury will entirely ignore them; disregard and dispel any such from their minds."

It is the province of the trial judge in passing upon the relevancy of evidence to which objections are made, to not

only decide the issue, but to also explain his rulings with reference to the proffered testimony. (8 Cal. Jur. 252, sec. 316.) With respect to that subject, the cited text reads in part:

"In ruling upon an objection to the relevancy of offered evidence, it is not improper for the judge to mention the fact to which the evidence is relevant, or to state the reason for his ruling, especially where he states that it is for the jury to determine whether the fact stated is proved. Such remarks, although made in the presence of the jury, are not addressed to them and will not be presumed to influence their actions."

There was no error in the conduct of the trial judge in permitting arguments to be made in the presence of the jury upon issues created by objections to the relevancy of evidence, nor in his comments upon the law or his application of the facts thereto.

The jury was very fully and fairly instructed upon the law of the case. After a careful reading of the entire charge, we are of the opinion there were no prejudicial errors in giving to the jury or refusing to give instructions. While numerous instructions which were given to the jury are quoted in the appellants' brief, and generally challenged with a few exceptions, particular objections to these instructions are not pointed out. The attention of the court should be directed to the particular language of instructions which is deemed to be objectionable or erroneous, and the reasons therefor should be assigned. ██ An appellate court is not presumed to search the record for erroneous instructions upon which to upset a judgment.

██ Several instructions on the subject of conspiracy are quoted and generally challenged on the ground that they are not applicable to the issues of the case and that they are confusing and misleading for the reason that the defendants were not charged with criminal conspiracy. In reading the charge as a whole, we are persuaded these instructions were properly given and that they were favorable to the defendants. They were evidently given to caution the jury against finding the defendants guilty upon uncorroborated evidence of accessories or coconspirators. Evidence of the conspiracy to steal gold-bearing ore from the mine was com-

petent as a part of the *res gestae* of the particular offense with which the defendants were charged. It was competent even though they were not charged in the indictment with a criminal conspiracy. Supported by a large number of authorities, that principle is stated in *People* v. *Gregory,* 12 Cal. App. (2d) 7, 15 [54 Pac. (2d) 770], as follows:

"It is next claimed that there was 'error in admitting against appellant evidence of an alleged conspiracy'. Appellant points out that there was no conspiracy charged in the indictment and that the prosecution was permitted to offer proof of an alleged conspiracy. We find no merit in this point for the admission of evidence of a conspiracy has been repeatedly sanctioned in this state even in the absence of a charge of conspiracy in the indictment."

■ It is insisted the court erred in failing to properly instruct the jury with respect to requiring corroboration of the evidence of an accessory pursuant to section 1111 of the Penal Code. Evidently the appellants are in error in that regard. Upon that subject we find that a correct statement of the law was given to the jury in an instruction in the following language:

"The court instructs the jury that while it is true that a conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence tending to connect the defendant with the commission of the offense, yet I charge you that such corroborative evidence need not tend to establish the precise facts testified to by accomplice. It is sufficient if such corroborative evidence standing alone tends to connect the defendant with the commission of the crime charged."

We find no prejudicial error in the challenged instructions.

The judgment and the order denying the motion for a new trial are affirmed.

Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 6, 1938, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 19, 1938.