[Crim. No. 2351. First Dist., Div. Two. Apr. 2, 1946.]

THE PEOPLE, Respondent, v. ADOLPH L. VOLLMANN,
Appellant.

.Harold C. Faulkner for Appellant.

Robert W. Kenny, Attorney General, David K. Lener and Miriam E. Wolff, Deputies Attorney General, Ralph E. Hoyt, District Attorney, and Folger Emerson and Cecil Mosbacher, Assistants District Attorney, for Respondent.

GOODELL, J.—This appeal was taken from a judgment of conviction of a violation of section 68 of the Penal Code, entered upon the verdict of a jury, and from an order denying a new trial.

Section 68 provides that "Every executive or ministerial officer, employee or appointee of the State . . . who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby, . . ." is guilty of a felony.

The indictment charged that on or about September 14, 1943, appellant, while assistant to the director of the farm production council, asked and agreed to receive from Nels E. Nelsen and Grant L. Ewing a bribe of $5,000 in connection with contracts which Nelsen and Ewing then had with the

state. This accusation was the outgrowth of a legislative investigation which culminated also in an indictment charging Nelsen under section 67½ with agreeing to give a bribe to appellant, to which accusation Nelsen pleaded guilty before this case went to trial. Ewing was granted immunity and became the principal witness of the State in this case.

A conversation on or about September 14, 1943, formed the basis for this prosecution, but there were several earlier discussions on the subject of money which the jury might well have connected with the later negotiations.

The theory of the State was and is that all the dealings between the parties, from first to last, were properly laid before the jury. The defense, on the other hand, strenuously claims that by admitting all this evidence the appellant was seriously prejudiced and the rule against proof of other offenses violated. Because of these opposing contentions a rather detailed recital of the facts is necessary.

In 1943 legislation was enacted (Stats. 1943, p. 307, Deering's Gen. Laws, Act 136; Stats. (2d Ex. Sess.), 1943, p. 3397, Deering's Gen. Laws, Act 134) designed to assure maximum crop production. It created the farm production council and provided for the recruiting, placement, transportation and housing of farm labor. Laborers in large numbers were brought into the state from Mexico, and one of the immediate problems was their housing. The appellant was employed on May 12, 1943, as an administrative assistant and on July 1 was appointed assistant to the director of the council and continued as such until October 31, 1943. He was given charge of locating suitable housing and negotiating for its procurement and assembling.

Ewing and appellant first met early in May, 1943, when Ewing called at the council's office in Berkeley to discuss the so-called Ewing-Way portable camp, made up of prefabricated units of the "Igloo" type, which Ewing had designed. Ewing told appellant that he believed the Hayward Mill & Lumber Co., at Hayward, could turn out the product in the required quantities. That company was owned by Nelsen, and he and Ewing first met about this time. They formed a partnership providing for a 60 per cent interest in Nelsen and 40 per cent in Ewing. After a visit to the Hayward plant and to Ewing's home, where a sample structure was inspected, appellant requested Nelsen and Ewing to submit a bid for

the housing units. Ewing's preliminary plans and drawings were taken to the council where, on June 22, Ewing completed the estimates and made out the bid. Appellant was present at these proceedings and directed his secretary, a state employee, to type the bid in finished form from information furnished by Nelsen and Ewing. This bid, submitted to the council by appellant on June 23, was for $16,929.95 for each 200-man unit of redwood or pine siding. At that time appellant reported the results of his investigation of the Ewing-Way product, and the minutes show that he requested the council to award the contract for the first ten units to Nelsen and Ewing. He stated that there was a good chance they would make speedy deliveries, but that if they were not awarded the contract deliveries might be delayed indefinitely. The council made the award with the proviso that appellant should draw up the specifications in collaboration with the department of finance and a Mr. Bowers of the attorney general's office.

Appellant communicated with two other firms of contractors, one operating in the San Francisco Bay Area and the other in Southern California, with respect to the submission of bids by them, but without fixing any date for their reception. No bids were received from either firm by June 23, when the award to Nelsen and Ewing was made. A bid from one of these firms, which came in on July 1, was declared by appellant to be a little too high, and a revised bid was submitted on July 3. The other (San Francisco) firm submitted a bid on June 30 but appellant notified that bidder a day or so later that the contract had been already awarded. The other firm was not notified of the rejection of its bid until early in August.

Soon after June 23 appellant informed Nelsen and Ewing that additional bids were required, and on June 28 Ewing delivered five additional bids: one of $19,500 per unit signed by James P. Morton (a carpenter working for Nelsen), who had nothing to do with its preparation; one of $23,607.05 per unit, submitted by Nelsen and Ewing, based on plans prepared by the University of California College of Agriculture; and three submitted by Hayward Mill & Lumber Co. based on plans prepared by the University of California for a four-man cabin, two-man bunk house, and six-man bunk house, respectively. These five bids were presented to Fred W. Links of

the department of finance when appellant, accompanied by an attorney of the council, called on him to present the requisition for ten labor camp units. Links testified that appellant told him that they had gone out and obtained these bids from various concerns, and that the main purpose in securing them was to see how quickly they could get the housing. He was informed that the council by resolution had approved the purchase of the Nelsen and Ewing product. He thereupon obtained from the director of finance authorization to approve the requisition.

A purchase order for the first ten units at a total cost of $169,299.50 was issued by the bureau of purchases on July 2, based of course on the award which had been made on June 23.

On June 30, appellant accompanied Nelsen and Ewing to the office of the War Production Board in San Francisco where Ewing worked out priorities. Later that day appellant and Nelsen appeared at the office of an insurance broker in San Francisco where arrangements were made for a $25,000 contractor's bond. Appellant called for this bond the following day.

About July 1 appellant informed Ewing that the council planned to award a contract for a second group of ten units and inquired whether his firm cared to bid on it, and in the course of a conversation about this time, according to Ewing, appellant told him that the two other firms already referred to were going to bid; that someone from the Southern California firm had offered appellant $25,000 for the contract, but "that he had turned him down, and, as far as he was concerned, we [Nelsen and Ewing] could have the contract."

Ewing also testified that in late July or early August appellant told him that during a trip south, from which he had just returned, one of the people connected with the firm of contractors which had a contract with the state to furnish food to these farm labor camps, had given him $1,700 or $1,750 (which had relieved a financial embarrassment of which he had theretofore complained) and that he had asked this person how he thought individuals like himself (appellant) lived. Ewing testified further that on several later occasions when appellant asked him if he had spoken to Nelsen, and Ewing had inquired "about what?," appellant had explained by making reference to the catering firm and its "gesture" toward him.

Nelsen and Ewing were awarded the second contract. The minutes of the council's meetings on July 6 and 7 disclose that the director discussed the advisability of contracting for ten more additional Ewing-Way camps and that he was authorized to enter into a contract to purchase them. Appellant wrote to the state purchasing agent enclosing bids for the second group of ten units, advised him that the council had decided to purchase them from Nelsen and Ewing, and a second purchase order, identical with the first, was issued by the bureau of purchases on July 13.

Nelsen and Ewing commenced work at the Hayward plant about a week after the first purchase order was received, and the first deliveries were made in late July and early August. During the construction work appellant visited the Hayward plant frequently, at times as often as every other day, checking on materials and making suggestions for the expediting of the work.

On August 1 Nelsen and Ewing submitted their first invoice for $16,929.95 for one unit, worded to conform with the purchase order. Actually numerous items specified in the purchase order had not been furnished, and Ewing testified that these omissions had been authorized by appellant. The council's accountant, who processed the invoices for payment, testified that he informed appellant that appellant would have to verify that everything had been furnished. Appellant wrote on the invoice "approved for payment" and signed his name. As each subsequent invoice was received, appellant was asked to approve it before it was sent to Sacramento for payment. He so approved all invoices between August 1 and September 24. He knew at the time he approved them that the units represented were not complete and that in the future a final adjustment would have to be made.

Shortly after the first invoice was submitted appellant advised Ewing that he would write a letter to the department of finance to expedite its payment. On August 10 the council's accountant wrote to the bureau of purchases requesting speedy payment of the Nelsen and Ewing invoice, and he testified that appellant repeatedly asked him to speed up their payments.

At appellant's instance, said accountant on August 25 prepared a letter for the signature of the director, advising

the state purchasing agent that it had been found necessary to eliminate certain dormitories and to substitute therefor certain mess halls with 100 tables; authorization was requested for this change plus a charge for delivery of all twenty camps "free on board our trucks" for $6,520, which figure represented the difference between the cost of the mess halls plus the 100 tables, and the cost of the dormitories. The original purchase orders had provided that the units were sold "F. O. B.—Delivered." The accountant testified, however, that appellant told him that the entire purpose of the change was to reimburse Nelsen and Ewing for the cost of loading the units. The request embodied in this letter was approved, and a change order was issued by the bureau of purchases on September 2.

On September 13 appellant visited the Hayward plant and advised Ewing that he had been instructed by the council to cancel the Nelsen and Ewing contracts. Ewing replied that they had expended considerable time, money, and material; that the contracts were almost completed as far as material was concerned, and asked him to join him in an inspection of the yard to see for himself. Ewing testified that during this tour appellant asked him whether he had talked to Nelsen. Ewing said, "What about?" "Well," he said, "you know," to which Ewing replied, "No, I don't. What do you mean?" Whereupon appellant said, "Well, it's time you boys got smart. I feel that I should have something for your having had this contract." Ewing responded that he would have to consult his partner before giving an answer. Appellant then suggested, according to Ewing, that one way to handle it would be to turn over to him the barn that Nelsen and Ewing were proposing to build at Bay Meadows race track. Several days later at Hayward appellant inquired if Ewing had spoken to Nelsen and was told that he had, and that they had agreed to take care of him. During this conversation appellant told Ewing that he had made a favorable recommendation respecting the threatened cancellation, and showed him an inter-office memorandum to that effect which he had prepared for the director on September 14. The contracts were not cancelled.

In the latter part of October, Nelsen and Ewing commenced the preparation of a final statement. Ewing testified that he consulted appellant about the final invoices at that

time, and was told to prepare them and that appellant would submit them. The original statement which Nelsen and Ewing submitted was not accepted. Appellant told Ewing it was not correct and that the council's attorney had himself prepared a statement as the basis for arriving at a settlement. Appellant told Ewing to work the original over, using the attorney's statement as a basis. This revised statement included an item of "Extras to contracts" totaling $11,855.68. Nelsen and Ewing then submitted a statement dated October 20 which also was not acceptable, and appellant advised them to break the loading charge down into a dollar value per unit and add it to the item of extras, and returned it with the suggestion that the next statement should so specify the loading charge. A final approved statement had not yet been submitted when appellant terminated his employment with the state on October 31. Appellant visited Ewing in Hayward on November 6 and advised him to speed up the preparation of the final statement.

On November 8 Ewing called at the council's office in Berkeley. He was then unaware that appellant had terminated his employment. He was advised in appellant's presence that another statement would have to be prepared which would be acceptable to Sacramento. Such other statement was prepared that day at the council's office, during which time the appellant was present. It was almost a five-hour session. At the same time the council's attorney, with the assistance of appellant, dictated a letter to the purchasing agent explaining and clarifying the substitutions, omissions and changes that had been made in the construction of the units, explaining that it had been discovered that complete units for 200 men were not necessary in some camps, whereas in other instances additional equipment was needed to round out a camp to conform to its requirements. Appellant signed this letter as "Assistant to the Director" eight days after the termination of his state employment.

Some time in August in a transaction having nothing at all to do with these state contracts appellant had interested the California Jockey Club in the possible use of Ewing's prefabricated product for some new race track stables. On October 9 the club authorized appellant to arrange for the erection of such prefabricated stables at Bay Meadows at a cost not to exceed $5,000. Five days later appellant in writ-

ing authorized Nelsen and Ewing to proceed with the construction of the stables. On November 20 Nelsen and Ewing met appellant at Bay Meadows race track and advised him that they had decided to turn over to him the stables under construction, although it then appeared that the cost would be $7,691.64, considerably in excess of the $5,000 originally stipulated. They accompanied him to the office where appellant had a stenographer type out an order for Nelsen and Ewing's signature, directing the Jockey Club to pay him the amount due for the stables. On November 22 appellant presented an invoice for the stables to the accountant at Bay Meadows and received the club's check for $7,691.64, payable to appellant. The following day Ewing called on appellant at Bay Meadows and informed him that Nelsen and Ewing's auditor had objected that the race track transaction had not been put through the Nelsen and Ewing books. Appellant had not yet cashed the check, and he accompanied Ewing to Hayward with the check and the order authorizing payment to him in his possession. The auditor examined the order and took them sharply to task with the comment that they knew better than to put through a deal like that; that as appellant was an inspector for the state, the transaction had the appearance of a bribe. New invoices were then made out to the Jockey Club, and appellant took them to Bay Meadows, returned the original check and received in exchange a check payable to Nelsen and Ewing for $7,691.64, to whom he delivered it.

On November 24, according to the State's evidence, Nelsen and Ewing again met appellant at Bay Meadows and Nelsen joined the appellant in his automobile and gave him ten $500 bills. The record shows that the day before the $5,000 was paid a $5,000 check had been drawn to "cash" by Nelsen and Ewing, on their own bank in Hayward. With this they procured a cashier's check from their bank for the same amount. This cashier's check was taken by Nelsen to a San Francisco bank, and in exchange for it he procured the ten $500 bills which Nelsen testified he gave to appellant at the race track. The books of Nelsen and Ewing show that $3,000 of this was charged to the personal account of Nelsen and $2,000 to Ewing (which was in accordance with their respective interests, i. e. 60 and 40 per cent). The following day was Thanksgiving, and on the day after that, the bank

records show that appellant visited his safe deposit box. Some months later the authorities opened the box under a search warrant, and found therein three $500 bills. Appellant admitted that he had received said $1,500 from Nelsen and Ewing but claimed it had been turned over to him by them in connection with a Puente race track transaction. Ewing testified that in early December, 1943, he asked appellant how he was getting along with the $500 bills and that appellant replied, all right and if he had any trouble he could deposit the money in some Texas bank.

The first point made by appellant is that ''it was prejudicial error to admit evidence of defendant's actions [prior to September 14] relating to preliminary negotiations, award of the contract, procurement of additional bids, procurement of a purchase order, the bond application, approval of invoices, payment of invoices, orders for changes in construction, payment of loading charges and issuance of change orders.'' Appellant's counsel object that this evidence implanted in the minds of the jurors inferences of wrongful intent and conduct apart from a possible bribe; namely, that the appellant dealt in bad faith with the two other contracting firms which submitted bids; that he rendered improper assistance to Nelsen and Ewing during the preliminary negotiations; that he was not in good faith in presenting the Nelsen and Ewing bid to the council; that he conspired to deceive the state finance department by representing that the contract was awarded by competitive bidding; that he in bad faith concealed and evaded the council's instructions to prepare plans and specifications; that he rendered improper assistance to Nelsen and Ewing in securing their bond; that he corruptly increased the profits to Nelsen and Ewing by directing that the state take delivery at the Hayward plant, transferring the burden of loading to the state, and introducing changes in the construction plans; that he in bad faith approved invoices for payment of funds not properly due, and sought to expedite payment of Nelsen and Ewing's invoices. Counsel point out that he was ''charged with asking for a bribe on September 14 upon an agreement to influence his official action in specified particulars in the future,'' and they pose the question whether he is to stand trial for every action taken by him prior thereto. ''Is there,'' they ask, ''to be put in issue and the defendant compelled to defend

possible mistakes or errors in judgment and the reasonableness of his actions prior to the time he is charged with asking for the bribe upon an agreement to do something in the future?" The appellant relies mainly upon *People* v. *Glass,* 158 Cal. 650 [112 P. 281], which case he claims forcefully and compellingly answers this question in the negative.

The appellant was on trial for agreeing to accept a bribe. It would seem that all evidence of the relations between the alleged offeror and offeree from which the inference could be drawn that the appellant suggested or solicited it, or went out of his way to favor the party from whom he hoped or expected ultimately to receive it, would be relevant, and the prosecution should be permitted to bring it out. It is true that the prosecution could have opened its case by proving the "it's time you boys got smart" conversation in the lumber yard on September 14 and what followed it, as already narrated, but surely the jury in that event would not have had the same grasp or understanding of the case as they got by the evidence (in more or less chronological order) of the preliminary matters leading up to that conversation. With respect to what evidence is admissible, beyond the very minimum needed to prove the exact offense on trial, Chief Justice Beatty had this to say in *People* v. *Cook,* 148 Cal. 334, 340 [83 P. 43] : "The prosecution in a criminal case is not obliged to rest upon evidence which merely establishes the guilt of the defendant *prima facie*—upon evidence, that is to say, which is merely sufficient in law to sustain a verdict of guilty. The guilt of the defendant must be proved beyond a reasonable doubt in order to secure such a verdict, and the district attorney not only may, but ought to, introduce all proper evidence at his command tending to establish the guilt of the defendant, in order to overcome any doubts or scruples of the jurors."

The dealings and negotiations antecedent to the September 14 conversation had to do with the actual performance of the Nelsen and Ewing contracts, which performance was under the immediate supervision of appellant. From that evidence the jury might have drawn the inference that appellant was improperly favoring Nelsen and Ewing and thereby seeking to ingratiate himself with them with the intention of laying the foundation or paving the way for a later solicitation. On the other hand they might have inferred that what

he did was dictated purely by a wholesome desire to be accommodating. If the circumstances were susceptible of an inference of wrongdoing connected with appellant's official dealings with Nelsen and Ewing, the prosecution was certainly entitled to get such evidence before the jury for the reasons so well stated in *People* v. *Cook, supra,* without being restricted to barely proving the conversation of September 14 and what followed it, which would do no more than get by a motion for a directed verdict. "The conduct of a defendant prior to the commission of the crime charged against him, which has a direct tendency to connect him with it and to identify him as a guilty participant therein, is both relevant and material." (8 Cal.Jur. 37, § 154.) In *People* v. *Sturman,* 56 Cal.App.2d 173, 182 [132 P.2d 504], the court said: "Evidence of the behavior of the accused is competent if it tends to prove intent . . . preparation, or any other acts inconsistent with innocence." See, also, *People* v. *Arnold,* 199 Cal. 471, 492 [250 P. 168]. Such evidence tended to establish the relationship between the appellant and Nelsen and Ewing (see *People* v. *Kelly,* 69 Cal.App. 558, 566 [231 P. 767]) and was admissible "at least as introductory and preliminary to other transactions, to give the jury an intelligent understanding of the whole of the evidence, and as bearing on the relations of the parties. Facts whose existence is a necessary preliminary to the relevancy of evidence are properly received, and facts which tend to explain or unfold a situation are admissible as establishing the relevancy of evidence. . . . The evidence, in the circumstances here disclosed, was introductory and preliminary, and was necessary to an intelligent consideration of what followed." (*Bedell* v. *United States,* 78 F.2d 358, 364.)

 The conversations between appellant and Ewing, wherein appellant is said to have told him of the $1,700 or $1,750 payment and of the $25,000 offer, are likewise attacked by appellant. It may be conceded that the testimony respecting the payment was proof of another offense, but even so, it was admissible under the settled rule that "Where the proffered evidence directly throws light upon the facts of the issue being tried, it is admissible although it proves another offense as well" (*People* v. *Ellis,* 188 Cal. 682, 689 [206 P. 753], quoting *People* v. *Smith,* 9 Cal.App. 644, 647 [99 P. 1111]) " 'the law will not thwart justice by excluding that evidence, simply because it involves the commission of another

crime'.'' (Id. 690, quoting *People* v. *Sanders,* 114 Cal. 216, 230 [46 P. 153].) This court had occasion to pass upon a similar contention in the recent case of *People* v. *Duncan,* 72 Cal. App.2d 247, 254 [164 P.2d 313], where we cited *People* v. *Kynette,* 15 Cal.2d 731, 746 [104 P.2d 794]; 20 Am.Jur. 293 et seq. and 22 C.J.S. 1089 et seq. See, also, 8 Cal.Jur. p. 60, § 168; *People* v. *Albertson,* 23 Cal.2d 550, 576 [145 P.2d 7]; *People* v. *Palassou,* 14 Cal.App. 123, 127 [111 P. 109]; *People* v. *Cook, supra,* 340.

That appellant's statement that he had actually received $1,700 or $1,750 from another contractor engaged on the same general project "throws light upon the facts of the issue being tried" is not open to question, for, if believed, it could mean but one thing, namely, that appellant was implanting in Ewing's mind rather broadly the suggestion that an offer from Nelsen and Ewing would be acceptable to him. It could be interpreted as outright solicitation, or, as said in *Bedell* v. *United States, supra,* it "reflected . . . his susceptibility to corruption."

Unlike the evidence just discussed, that in *People* v. *Glass, supra,* which was held to be erroneously admitted, was *in no way related to or connected with the case on trial,* as it had to do with the efforts (not amounting to a criminal offense) of the corporation of which Glass was an officer, to keep a competing company from obtaining a franchise in Oakland. The offense for which Glass was on trial was alleged bribery committed four years later in an attempt to keep the same competitor out of San Francisco. This distinction is pointed out in *People* v. *Ellis, supra,* at p. 691. We are satisfied that neither the Glass case nor any other authority cited by appellant, indicates that the evidence just discussed was erroneously admitted, but are convinced, on the other hand, that the prosecution was entitled to have all of it—as telling the whole story—laid before the jury.

Appellant contends that the court erred in admitting evidence of the amount of Nelsen and Ewing's profit. The respondent proved that their profit on the two contracts was "a little over $152,000." "It is difficult to comprehend," says appellant's counsel, "any matter which would be . . . so prejudicial to defendant's right to a fair trial." The respondent answers that it was the appellant who opened up the subject. On the *voir dire* examination a prospective juror was asked: " . . . If it develops in the course of this trial

that ... Nelsen and Ewing have made a profit from the State of California in the sum of $152,000 during the course of twenty weeks' work, that fact in itself will not prejudice your mind against the defendant Vollmann, will it?'' Again, in cross-examining Nelsen, appellant brought out that the profit was at least $150,000. It already appeared that Nelsen's share in the venture was 60 per cent and Ewing's 40 per cent. Nelsen was asked by the defense: ''It is also your hope, as you sit there as a witness in this case, that, as a result of the assistance,—whatever it may be,—that you have given to the State of California, the State of California will not sue you for the $90,000 profit you made?'' ''. . . The judgment will not be reversed because of the erroneous admission of evidence where the disputed fact is shown to have been proved by the evidence of the defendant, or by the defendant's cross-examination of a witness for the prosecution. . . .'' (4 Cal.Jur. 10-Yr.Supp., 1943 Rev., p. 999, § 599; *People* v. *Renteria,* 60 Cal.App.2d 463, 472 [141 P.2d 37] and cases cited; *People* v. *Juehling,* 10 Cal.App.2d 527, 534 [52 P.2d 520].) Moreover, appellant's counsel in their argument referred several times to the $152,000 profit, and closed with these words: ''. . . As I leave you, may I just put these figures on the board, because sometimes figures are so confusing—but let me leave you with these figures, if you please, and take them into the jury room: $152,000; that represents the profit that those men made.''

We are satisfied that there was a clear waiver of whatever error there might have been in admitting evidence of profit. It is for that reason unnecessary to discuss the appellant's authorities to the effect that it was error to admit the evidence, or to pass upon the question of its admissibility.

■ Appellant also claims that the admission of evidence of his acts and conduct after he left the state's employ on October 31, 1943, was prejudicial error. Such acts and conduct have been already fully stated. If from such evidence the inference could be drawn that appellant aided Nelsen and Ewing in getting something to which they were not entitled, the prosecution was entitled to have it in evidence as a circumstance tending to prove that appellant, although no longer in authority, was carrying out his part of the bargain of September 14. Counsel for appellant say that appellant's ''actions after he terminated his employment could not form the basis of any prosecution under section 68 of the Penal

Code where it must not only be shown that the defendant is an officer or employee of the State but that he asks for a bribe in connection with a matter then pending before him or which might be brought before him in his official capacity.'' That is, of course, true. But that does not mean that a person who, while occupying office, had agreed to take a bribe could not be shown to have taken steps after leaving office in performance of the corrupt agreement, or to help out the persons to whom he still looked for payment.

''It is permissible to show the various steps taken by accused in committing the crime, including preliminary negotiations with the other parties *and his acts subsequent to the offense charged,* which tend to confirm that charge.'' (11 C.J.S. 871.) (Emphasis added.) The authorities cited by respondent holding that evidence of subsequent acts and conduct is admissible are in point and show this to be the prevailing rule. (*People* v. *Furlong,* 140 App.Div. 179 [125 N.Y.S. 164, 168]; *Stovall* v. *State,* 104 Tex.Cr.Rep. 210 [283 S.W. 850, 852]; *State* v. *Gardner,* 88 Minn.130 [92 N.W. 529, 535]; *People* v. *O'Neil,* 109 N.Y. 251 [16 N.E. 68, 71]; *Commonwealth* v. *Barker,* 311 Mass. 82 [40 N.E.2d 265].) On the other hand, the authorities cited by appellant on this point, while holding that certain evidence had been erroneously received in bribery cases for one reason or another, do not support the claim he now makes. None of them holds inadmissible evidence of the acts and conduct of a defendant after he has left the position or office which he occupied at the time of the corrupt agreement.

Our views and conclusions on this point are the same as those already expressed with respect to acts and conduct prior to September 14, namely, that there was no error in admitting this evidence.

The appellant contends that ''the verdict is contrary to the evidence, and the evidence is insufficient to sustain the verdict.''

In language which paraphrased the indictment the court instructed the jury that it must find ''that the defendant intended or agreed that his official conduct should be thereafter unlawfully influenced upon at least one of the following matters:

''1. In approving, recommending, obtaining or procuring . . . changes, alterations or revisions in the contracts and purchase orders . . . ; or

"2. In recommending . . . that said contracts and purchase orders be not cancelled; or

"3. In approving for payment, invoices or claims submitted . . . under said contracts and purchase orders or such changes, alterations and revisions thereto."

█ Appellant contends that the record is entirely lacking in evidence which would justify the jury in concluding that he had agreed that his official conduct should be *thereafter* influenced in any of these particulars. On the contrary, he argues that Ewing's testimony as to the words used, namely, ". . . I feel that I should have something for your having had this contract," was *direct* evidence conveying the idea of a gratuity or reward for *past acts or services,* and that it overcame all *inferences* based on circumstantial evidence that a bribe was sought for the purpose of influencing his conduct in the *future.* The respondent answers that the appellant cannot single out a part of one conversation—that of September 14—or one set of words, but that everything appellant said and did on, before and after that date was before the jury, and presumably was weighed and considered in reaching the verdict. (*People* v. *Elliott,* 103 Cal.App. 329, 331 [285 P. 401].) We agree with this view. "The offer or solicitation of a bribe need not be stated in express language as such; it is sufficient that the words used carried the import of a bribe and were evidently intended to bear that meaning. . . ." (11 C.J.S. 843.) Further, "It is permissible to show the various steps taken by accused in committing the crime, including preliminary negotiations. . . ." (11 C.J.S. 871, *supra.*) It must be remembered that the conversation of September 14 was not the first time the subject had been broached. A full month before that, when appellant had returned from the south, he had, according to Ewing, told Ewing in so many words, that a person connected with the catering contractors had given him $1,700 or $1,750. This itself might well have been viewed by the jury as a solicitation by the process of suggestion. Moreover Ewing testified that on several later occasions when appellant had inquired if he had spoken to Nelsen, and Ewing professed ignorance of what was meant, appellant answered with a cryptic reference to the $1,700 or $1,750 "gesture." Then, too, there was the conversation testified to by Ewing where appellant told him in so many words that he had declined a $25,000 offer with the remark that "as far as he was concerned, we [Nelsen and Ewing]

could have the contract.'' This, too, might have been taken by the jury as a broader hint or suggestion, for it indicated that appellant's refusal was coupled with a favoritism toward Nelsen and Ewing. The People's case did not depend on any single or isolated conversation, and these two earlier conversations, and the others where appellant inquired if Ewing had spoken to Nelsen, were just as much direct evidence as was the conversation of September 14.

Moreover, there was more to the September 14 conversation than the reference to the past award of the contract. Appellant, according to Ewing, then told him in substance that his mission to the Hayward plant that day was to let them know ''that he had been instructed by the California Farm Production Council to cancel out our contract.'' This was part and parcel of the same conversation and he chose that particular time and occasion to associate and couple the two subjects together. Appellant was the man in authority who had direct and almost complete supervision of the Nelsen and Ewing contracts and their performance. Nelsen and Ewing were, so to speak, in his hands, and the jury might well have drawn the inference that regardless of the phrasing of the suggestion, a bribe was then and there solicited not for past performance but for appellant's direct and immediate influence in defeating the threatened and impending cancellation.

Moreover, it must be remembered in considering the question, whether future influence was in the minds of the parties that in the conversation several days after September 14, when Ewing told appellant that they had agreed ''to take care of him,'' appellant told Ewing of the favorable recommendation he had made respecting the cancellation, supporting his statement by documentary proof. From this the jury could have inferred that although in the September 14 conversation appellant spoke of getting ''something for your *having had* this contract'' his real meaning and intent was *getting something for putting a halt to the cancellation.*

In addition to what has been said there was sufficient evidence for the jury to conclude that appellant in fact approved, recommended, obtained and procured changes, alterations, or revisions in the contracts and purchase orders; that he recommended that the contracts and purchase orders be not cancelled; that he approved for payment invoices or claims submitted by Nelsen and Ewing. Those facts (if found) of

themselves were indicative that the agreement in question had been made. Coupled with the conversations above related, or independently of them, they were sufficient to warrant the jury in concluding appellant had entered into an agreement as to his *future* conduct.

It is the appellant's position that though the prosecution's evidence, if believed, may establish that Nelsen and Ewing agreed to pay him a bribe, there is no evidence that the agreement on their part was based on an understanding that appellant's action on matters then pending or thereafter brought before him in his official capacity would be unlawfully influenced thereby, as charged in the indictment. He points out that his recommendation against cancellation of the contract and purchase orders was made prior to notification from Nelsen and Ewing that his request of September 14 was agreeable to them; nor is there any evidence, he asserts, that from the time of that conversation Nelsen and Ewing ever requested him to act in a particular manner or to aid them in any way that could possibly be construed as unlawful, corrupt or even improper. In this connection it must be remembered that no "meeting of the minds" is required to establish an agreement to take a bribe. (*People* v. *Powell,* 50 Cal.App. 436, 442 [195 P. 456] ; *People* v. *Kerns,* 9 Cal.App.2d 72, 75 [48 P.2d 750] ; *People* v. *Brigham,* 72 Cal.App.2d 1 [163 P.2d 891].) "It is not necessary that there be an understanding, in the sense of an agreement, with the person unlawfully approached but merely an understanding on the part of the bribe seeker himself that his official action shall be influenced." (*People* v. *Kerns, supra,* at p. 75.)

Appellant, while frankly recognizing that ordinarily it is within the trial court's discretion to allow testimony in rebuttal which might have been given earlier, claims that the court in allowing Nelsen to testify, as a rebuttal witness, that he actually handed appellant ten $500 bills, abused its discretion. Counsel argue that Nelsen was placed on the stand by the prosecution "to end the case in its entirety upon a high note of victory for its cause" and that, under the circumstances, such procedure was decidedly unfair. As part of the prosecution's case proof had been made of the conversion of the $5,000 check into a cashier's check and *its* use to procure at a San Francisco bank the ten $500 bills; and testimony had been given by Ewing of his later conversation with appel-

lant respecting his getting rid of the $500 bills. From all this evidence the jury could have concluded that the $5,000 had actually changed hands, without Nelsen's testimony as to the details of its manual delivery. Appellant admitted that three of the $500 bills had come to his hands from Nelsen and Ewing but explained that $1,500 was for the Puente transaction. It was then, and then only, that the prosecution put Nelsen on the stand in rebuttal to prove that he had personally handed the ten $500 bills to appellant.

In view of the state of the record prior to the rebuttal testimony—including all the evidence respecting the $7,691.64 check issued to appellant in the Bay Meadows transaction and later cancelled—we are satisfied that there was no abuse of discretion. It is not necessary to cite authorities holding that the court had such discretion, for, as above indicated, the appellant concedes the general rule in that regard.

■ It is next claimed by appellant that the court erred in limiting the cross-examination of Nelsen. As we have just seen, he testified in rebuttal that he handed appellant ten $500 bills at Bay Meadows race track. On cross-examination he was asked, "Isn't it a fact, Mr. Nelsen, that you have told Mr. Hoyt that you never gave Mr. Vollmann a bribe?," to which an objection was interposed without any statement of the ground therefor, and was sustained without comment by the court. The question was repeated several times in varying forms (for instance, "never gave five cents to Mr. Vollmann as a bribe"; "never given any money"), and none of the district attorney's objections (each of which was sustained) specified any grounds beyond "incompetent, irrelevant and immaterial." Counsel for appellant did not indicate (and, as will presently appear, did not have to) whether the questions were asked with a view to later calling witnesses to contradict Nelsen if he answered in the negative. In the course of argument on the admissibility of this evidence counsel for appellant said to the court, ". . . in the examination of Mr. Vollmann, questions were asked him as to whether or not he made certain contradictory statements to the district attorney. I have asked this witness if he had made contradictory statements to the same district attorney, in the same month; and I . . . ask your Honor to review again the ruling that I may not show that, in the month of June, 1944, this

witness,—who says, now, that he gave money at that time to Mr. Vollmann,—told the district attorney he had not.

"Mr. Emerson: Judge, that wasn't the foundation that was laid for those questions at the time I objected to it. If they are offered as impeachment and the proper foundation is laid,—I have no objection to them."

That the questions were not legally objectionable in the form in which they were cast (without following the impeachment formula indicated by § 2052, Code Civ. Proc.) is clear from the discussion of this subject found in *People* v. *Jones,* 160 Cal. 358 at 365 [117 P. 176], in *People* v. *Ho Kim You,* 24 Cal.App.451 at 458-9 [141 P. 950], and in 10 So.Cal. Law Rev. 145. In *People* v. *Jones, supra,* 365, it was held to be "an unwarranted curtailment of legitimate cross-examination to exclude such questions, . . . upon the ground that they are necessarily impeaching questions and the proper foundation for them has not been laid," citing *People* v. *Hart,* 153 Cal. 261 [94 P. 1042]. In *People* v. *Campos,* 10 Cal.App.2d 310, 317 [52 P.2d 251], the court said, "It is always proper, for the purpose of discrediting a witness by his own admissions, to interrogate him, on cross-examination, as to prior inconsistent statements without calling attention to time, place, circumstances, and persons present. (27 Cal.Jur., p. 159, § 133; *People* v. *Jones,* 160 Cal. 358 [117 P. 176]; *People* v. *Ho Kim You,* 24 Cal.App. 451 [141 P. 950]; *People* v. *Williams,* 43 Cal.App. 60 [184 P. 498].)"

While we are satisfied that it was error to sustain these objections, the question remains whether such error was prejudicial.

If the witness had been permitted to answer, and had admitted that he had *told* the district attorney that he had never given appellant a cent, it would not have been affirmative or competent evidence of the *fact* that he had not given appellant a bribe of $5,000 or any other sum. If he had denied such statement and some other witness had proved that he had heard it made the result would be the same. "It has been held in numerous cases," said the court in *Lopez* v. *Wisler,* 58 Cal.App.2d 455, 462 [136 P.2d 816] (citing them) "that when a witness is impeached by proof of prior inconsistent statements the effect is merely to discredit him as a witness, and that the former statements made by him are incompetent for any other purpose."

While such an admission by Nelsen or proof by some other

(impeaching) witness would have discredited Nelsen's entire testimony, it must not be forgotten that he had been already discredited and impeached by his admission that he had entered a plea of guilty to his indictment for a violation of 67½, agreeing to give a bribe to appellant—a felony. (Code Civ. Proc., § 2051.)

Before Nelsen had been put on the stand the following evidence had gone before the jury from the testimony of other witnesses and from documentary evidence as well, all touching upon the question of *payment*: that, at the race track appellant had caused to be drawn up a writing, which Nelsen and Ewing had signed, directing the Jockey Club to pay appellant the $7,691.64; that a check for that amount had been drawn by the Jockey Club to appellant's order and given to him; that Nelsen and Ewing's accountant had taken them to task for handling the transaction in this way, making it appear that appellant, a state inspector, was being bribed; that the check had been recalled, and a new one issued to the order of Nelsen and Ewing and the transaction put through their books in the regular way; that then the $5,000 check had been drawn to "cash" (charged to Nelsen and Ewing in their respective shares), converted into a cashier's check and that check given for the ten $500 bills; that appellant had visited his safe deposit box two days later (the intervening day being a holiday); that appellant had been asked how he was getting on with the large denomination bills and made the reply that if he had any trouble he could deposit them in a Texas bank, and that three $500 bills had been found in his safe deposit box. All this evidence, we repeat, went in independently of Nelsen's testimony or his credibility and it was of course sufficient by itself to warrant the inference that $5,000 in money had passed. It was not, however, necessary for the prosecution to prove payment. An agreement was all that had to be proved, and the only bearing payment had on that issue was that from actual payment an antecedent *agreement* to pay would be a logical inference. It was corroborative evidence only.

There was an abundance of evidence in the record, apart from Nelsen's testimony, to establish the understanding and agreement which, after all, was the issue in this case.

In *People* v. *Williams,* 43 Cal.App. 60 [184 P. 498], the trial court had curtailed the cross-examination, as in the

case at bar, and while on appeal it was held to be error it was not prejudicial error. We are disposed to say as was there said: "A survey of the whole record of the case, however, which discloses ample testimony to warrant the conviction of the defendant, compels the conclusion that the error complained of has not resulted in a miscarriage of justice. The case seems to be one for the application of section 4½ of article VI of the constitution of this state."

The prosecution was permitted to introduce evidence that on November 24, 1943, Nelsen and Ewing's own bank issued a cashier's check to Nelsen in the amount of $5,000, and that on the same day Nelsen cashed that check at a San Francisco bank, receiving bills of large denominations. Appellant objects that neither of these transactions was in his presence and the money received was not traced into his possession. He relies on *People* v. *Bissert*, 75 App. Div. 118 [75 N.Y.S. 630]. The appellant therein had been convicted of accepting a bribe of $550. The court in holding it was error to permit evidence that several days prior to the transaction the other party withdrew $450 from the bank said: "It is not claimed that the defendant induced her to draw this money from the bank, or that any of it was traced into his possession. . . . Had the money drawn from the bank been traced into the defendant's possession, or *had there been established some fact from which that inference could be properly drawn*, then it might be considered by the jury; . . ." (Emphasis added.)

Here sufficient facts were established from which the inference could be reasonably drawn that the money in question found its way into the appellant's possession. Ewing testified that after Nelsen's visit to the bank in San Francisco they proceeded to Bay Meadows, where they met appellant; Nelsen testified that he then and there gave appellant ten $500 bills; a search of appellant's safe deposit box disclosed three $500 bills. The facts here are in many respects similar to those in *People* v. *Graves*, 137 Cal.App. 1 [29 P.2d 807, 30 P.2d 508], where Graves was convicted of accepting a bribe of $80,000 on the understanding that as a member of the board of supervisors he would vote in favor of the acceptance by the board of a compromise of a claim for certain construction work. Evidence was admitted that on a date subsequent to the approval of the compromise a man later identified as

Graves purchased with currency a cashier's check for $40,000, at a San Francisco bank and a cashier's check for $17,000 at another bank in San Francisco. It was also established that on the day these two checks were purchased, a firm interested in the compromise withdrew from its account in still another bank in San Francisco $80,000 in currency. Testimony in relation to the withdrawal of this sum was objected to on the ground that it was irrelevant and not in any way connected with appellant. In rejecting this argument, the court said: "This fact would be very important when joined with the fact that immediately following the payment on the compromise, appellant went to the city wherein the contractors maintained their headquarters and there became possessed of a large sum of money in currency, and acting under an assumed name disposed of it as hereinbefore shown. Notwithstanding the argument of counsel that contractors were used to handling large sums of money, the present commercial practice of transferring credit by check from bank to bank in the discharge of obligations seems to mark the withdrawal of such a large sum of currency as an unusual circumstance. We think the evidence was properly admitted as a circumstance in the unfolding of the case."

In the course of his closing argument the assistant district attorney commented upon the fact that "Mr. Faulkner, in all of those questions, very carefully avoided asking Mr. Nelsen the one question . . . which the state could not ask; . . . 'Did you, through Mr. Ewing, have an agreement and understanding and offer money or a barn to the defendant?' " The court denied appellant's request that these remarks be stricken from the record and that the jury be admonished to disregard them, with the comment that "if the question had been asked by the defense, I would have allowed Mr. Nelsen to answer it." As previously noted, the evidence presented to the jury was clearly sufficient to establish that the appellant requested a bribe on the understanding and agreement that his official conduct would be influenced thereby. *People* v. *Brigham,* 72 Cal.App.2d 1 [163 P.2d 891], and other cases already cited, establish that to support the conviction it is only necessary to establish the agreement and understanding on the part of the accused officer, and that the state of mind of the parties from whom the bribe was

solicited is immaterial. Any inference that the jury might have drawn from the argument that Nelsen and Ewing for their part entered into an agreement would but add additional force to the point already well established that there was an agreement on the part of the appellant.

Any error which might have resulted from the remarks of the assistant district attorney and the comment of the court was cured by the following instructions: "The jury has no right to speculate as to the views of the judge as to any fact or any inference he may have because of anything he may have said or done during the trial, or because of any ruling he has made in permitting or excluding any evidence offered by either side. . . . You are hereby further instructed that the opening statement of the district attorney and statements and arguments of counsel, . . . are not in themselves evidence in this case; and that any statements, made by counsel either during the trial or argument which are not supported by the evidence or which are inconsistent with my instructions as to the law are to be disregarded by you . . ." In *People* v. *Matthew*, 68 Cal.App. 95, 109 [228 P. 417], the court said: "Upon the final submission of the case the court instructed the jurors to the effect that they were the exclusive judges of the evidence and the credibility of the witnesses, that it was their function to determine all questions of fact that the court had nothing to do with the facts, and that if it had said anything during the trial which might seem to indicate that it had an opinion upon any of the facts, such expressions should be entirely disregarded by them. This was sufficient to remove all apprehension that the remarks of the court would have any prejudicial effect upon the minds of the jurors." See, also, *People* v. *Siderius*, 29 Cal.App.2d 361, 371 [84 P.2d 545].

In an instruction on circumstantial evidence, the court said:

"If two reasonable inferences, one of guilt and one of innocence, may be drawn from such chain of circumstances, or if any necessary link in such chain is not proven to the exclusion of a reasonable doubt, then the defendant cannot be convicted, but all that is required to convict is this: If the testimony in the case is sufficient to convince the jury beyond a reasonable doubt and to a moral certainty that the [defendant] did commit the crime charged, then it is the duty of the jury to convict the defendant of such crime, although the fact may be surrounded in a degree by some possible or

fanciful doubt, surmise or conjecture not arising from a consideration of the evidence. If a reasonable explanation or construction compatible with the innocence of a defendant may be drawn from the evidence, or if two reasonable inferences, one of guilt or one of innocence, can be found from the same facts or circumstances then the jury must acquit.''

Claiming that this instruction was improper, appellant relies upon the recent case of *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8]. The evidence to support the conviction of first degree murder in that case was entirely circumstantial. The court instructed the jury as follows: ''If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.'' The similarity between that instruction and the one given in the instant case is apparent. The Supreme Court agreed with the appellant there that in every case where circumstantial evidence is received, it should be declared to the jury in unequivocal language ''that, to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.'' (P. 173, quoting 8 Cal.Jur. 371, § 405.) The court indicated its approval of the statement in *People* v. *Hatchett*, 63 Cal. App.2d 144, 155 [146 P.2d 469], that this requirement is not met by an instruction to the jury that the guilt of the defendant must be established beyond a reasonable doubt, or that as between two opposing reasonable inferences the one which is consistent with innocence must be preferred to the one tending to show guilt. Nevertheless, the court concluded that the failure to instruct the jury in the language above quoted was not necessarily ground for reversal, in view of the constitutional provision that ''No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error . . . has resulted in a miscarriage of justice.'' (Art. VI, § 4½.) The court then proceeded to consider the instruction given: ''This instruction is eminently proper as far as it goes. To it should have been added a direct statement of the precise principle under discussion. . . . Since the

quoted instruction was given, the failure to give the further instruction is not, upon the facts of this record, ground for reversal." The court's language is equally applicable to the instant case. (See, also, *People* v. *Graves,* 137 Cal.App. 1, 21 [29 P.2d 807, 30 P.2d 508].)

The judgment and order appealed from are and each of them is affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 19, 1946.